[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
Alexis P. was born on July 9, 1991 at Mt. Sinai Hospital, Hartford. Co-terminus petitions were filed by the Commissioner of the Department of Children and Youth Services (DCYS) on July 19, 1991 pursuant to General Status Section 17a-112.
The neglect/uncared for petition alleges that the child would be permitted to live under conditions, circumstances, or association injurious to her well-being; has been abandoned; and, is homeless. The termination petition was amended on September 17, 1991, that petition, as amended, alleges the statutory grounds of abandonment, and acts of commission or omission. General Statutes Section 17a-112(b)(1) and (3). The petitioner is requesting a waiver of the one year requirement pursuant to Section 17a-112(c).
Notice And Jurisdiction
At the time of the filing of the petitions, the court granted an ex parte order of temporary custody. Both petitions listed the mother of the child as Mary P., address unknown; the father was designated as "Unknown". Pursuant to an order of notice, publication was effected in the Hartford Courant; the legal advertisement stated that the hearing on the order of temporary custody was scheduled for July 26, 1991, and on the co-terminus petitions, for August 13, 1991. Mary P. appeared, with court appointed counsel, at the OTC hearing on July 26; she was served in hand on that date, a new attorney was appointed to represent her, the OTC was confirmed "without prejudice" to a subsequent hearing thereon, and the plea date was again stated to be August 13, 1991, at 10:45 A.M. Mary P. did not appear at the August 13 hearing; on that date service by publication and in hand was confirmed, pro forma denials were entered, and the matter was continued for a default trial, with the understanding that the attorney, in the interim, would undertake to locate mother through the address and telephone number provided at the previous CT Page 1146 hearing. On September 17, 1991, mother again did not appear; her attorney reported that he had left two message for Mary P. to be in court on that date or risk losing her child. On October 1, 1991, the second day of trial, respondent/mother did appear, again provided the 2572 Main Street address and telephone number as the correct means of reaching her, and at the completion of that day's evidence, was informed that the trial would resume on October 29, 1991, at 2:00 P.M. On the afternoon of October 29, mother's attorney advised that he had received a call indicating that the respondent was unable to attend the hearing as she had been taken to Mt. Sinai Hospital for "seizures that started at 3:00 AM related to drugs". The petitioner was permitted to complete its evidence and respondent's attorney was asked to confirm the mother's admission and/or treatment (ER, in-patient. out-patient) at Mt. Sinai and, if confirmed, to request a further hearing to permit additional cross-examination and presentation of additional evidence. By letter, the attorney subsequently advised the court that the respondent/mother had not been admitted to, or treated at, Mt. Sinai Hospital on the prior date of trial (10/29/91); accordingly, as of November 5, 1991, decision on the co-terminus petitions was reserved.
As stated heretofore, service by publication and in hand was confirmed with respect to respondent/mother; and, an identifiable father is not known. Service has been effected in accordance with the requirements of law. General Statutes Sections 17a-112(e) and45a-716. This court has jurisdiction to hear and adjudicate the co-terminus petitions. General Statutes Sections 17a-112(e), 46-129, and 45a-717.
 Procedure Relative To Co-Terminus Petitions
Where neglect and termination petitions are coterminously filed under Section 17a-112(e) of the General Statutes, the court is required to proceed in three separate stages.
(1) Adjudication of The Neglect Petition
The court must determine, by a fair preponderance of the evidence, if the child has been neglected or uncared for as of the date the petition was filed or last amended. If the petitioner's evidence does not support such a finding, then both petitions must be dismissed since they are predicated on the same alleged facts. If the court finds the child to have been neglected or uncared for, disposition is to be deferred until a decision is rendered on the termination petition.
(2) Adjudication of the Termination Petition CT Page 1147
The court must next determine whether the proof provides clear and convincing evidence that any pleaded ground exists to terminate the parents' rights, as of the date of filing (or last amendment). If no such ground for termination is found, the court must proceed on the neglect petition and consider an appropriate disposition. However, if at least one alleged ground to terminate is found, the court must move on to the third stage.
(3) Disposition On Both of The Petitions
If grounds have been found to adjudicate the child neglected or uncared for, and to terminate parental rights, applying the respective standards of proof, the court must then consider whether the facts as of the last day of trial establish by clear and convincing evidence, after consideration of the six factors enumerated in General Statutes Section 17a-112(d), that termination is in the child's best interest. If the court does not find that the child's best interests would be served by terminating parental rights, it must return to, and dispose of the neglect petition. If the court does find that termination serves the child's best interests, an order should enter terminating parental rights.
Standards of Proof
A fair preponderance of the evidence standard of proof is the proper standard in neglect proceedings. In re Juvenile Appeal (84-AB), 192 Conn. 254, 264 (1984).
With regard to "termination of parental rights", that term is statutorily defined as "the complete severance by court order of the legal relationship, with all its rights and responsibilities, between the child and his parent or parents so that the child is free for adoption except that it shall not affect the right of inheritance of the child or the religious affiliation of the child." General Statutes Section 45a-707(g). It is a judicial matter of exceptional gravity and sensitivity. Anonymous v. Norton, 168 Conn. 421, 430 (1975). Termination of parental rights is the ultimate interference by the state in the parent-child relationship and, although such judicial action may be required under certain circumstances, the natural rights of the parents in their children "undeniably warrants deference and, absent a powerful countervailing interest, protection." Stanley v. Illinois, 405 U.S. 645, 651 (1972); In Re Juvenile Appeal (Anonymous), 177 Conn. 648, 671 (1979). The integrity of the family unit is protected by the Ninth Amendment and the Due Process and Equal Protection clauses of the Fourteenth Amendment to the United States Constitution. Stanley v. Illinois, supra. "The right to family integrity includes `the most essential and basic aspect of familial privacy — the right of the family to CT Page 1148 remain together without the coercive interferences of the awesome power of the state.'" Duchesne v. Sugarman, 566 F.2d 817. 824 (2d. Cir. 1977); In Re Juvenile Appeal (83-CD), 189 (Conn. 276 (1933). Both the child and the parent(s) have constitutionally protected interests in the integrity of the family. Santosky v. Kramer, 455 U.S. 75 (1982). And, the "rights of parents qua parents to the custody of their children is an important principle that has constitutional dimensions." See: In Re Juvenile Appeal, 187 Conn. 431, 435 (1982).
The constitutional guarantee of due process of law requires that the statutory ground(s) for termination of parental rights be established by "clear and convincing" evidence, not merely a fair preponderance. Santosky v. Kramer, supra. Thus, the standard of proof as mandated by Conn. General Statute Section 17a-112(b) and Prac. Bk. Section 1049 is "clear and convincing" evidence. See: e.g. In Re Juvenile Appeal (84-3), 1 Conn. App. 463 (1984).
Termination of parental rights is in two stages: the adjudication and the disposition. The adjudicatory stage involves the issue of whether the evidence presented established the existence of one or more of the statutory grounds as of the date the petition was filed, or last amended. In Re Juvenile Appeal (84-AB), supra at p. 262; In Re Nicolina T, 9 Conn. App. 598, 602
(1987); In Re Luke G., 40 Conn. Sup. 316, 324 (1985). Only upon establishment of one or more of the statutory grounds, may inquiry be made regarding the ultimate best interests of the child. Id. However, since Section 17a-112(b) sets forth the statutory grounds for termination in the disjunctive, one ground only need be established for the granting of the petition. In Re Juvenile Appeal (84-BC), 194 Conn. 252, 258 (1984); In Re Nicolina T., supra.
Factual Findings
The evidence and documentation before the court established the following facts.
Alexis P., d/o/b July 9, 1991, is the sixth child born of Mary P. The mother was born July 22, 1956 (DCYS also has a birth date of 1/29/54 on record), one of thirteen siblings; she has a tenth grade education, suffers from epileptic seizures, has a length history of drug abuse, and has been involved in methadone treatment programs on numerous occasions.
The official court file reveals court proceedings involving all of Mary P.'s other five children. Desiree P. and Nicole P. were born to Mary P. on July 29, 1982 and July 18, 1983, respectively; these two children were committed to DCYS on February 17, 1987 and parental rights to both children were CT Page 1149 terminated on June 18, 1991. Desiree and Nicole P. reside in the Knighton foster home and, as stated, have been free for adoption.
Carvan and Kelley were both born cocaine addicted on July 29, 1985 and December 31, 1986 respectively; both were committed to DCYS on May 31, 1990 and have remained in foster care with their maternal aunt, Jesse S., of Hartford. Sierra P. was born December 27, 1989; mother had had no prenatal care and the child was born addicted to cocaine with Meconium Aspiration. Co-terminus petitions were filed on Sierra, an OTC was obtained, and thereafter, it was determined that Mary P. was confined at Niantic. Sierra remained hospitalized from date of birth to March 16, 1990 from illnesses attributable to the mother's drug abuse; on March 16, she was placed in a foster home where for several months she was required to take various medications every few hours and was regularly on a breathing machine. Parental rights to this child were terminated on July 26, 1990 and the child, as of July 1991, was in the process of being adopted.
With respect to Alexis P. (d/o/b 7/9/91), DCYS received the referral from Mt. Sinai Hospital on July 11, 1991 stating that Mary P. had given birth to her sixth child, born heroin and cocaine addicted. The hospital informed the DYCS social worker that the mother was to be discharged on July 12, but that baby would remain hospitalized due to withdrawal symptoms and complications. Following mother's discharge, both the hospital and the DCYS worker tried to locate her, but were unable to do so; she had given the hospital the 2572 Main Street address, but also stated she was residing at the Budget Inn. After investigating both addresses to no avail, and following other efforts, DCYS obtained the OTC on July 20, 1991. Documents submitted in support of the OTC recited that as of that date, Mary P. had not contacted the hospital relative to the baby's discharge; that the management at the Budget Inn, when contacted. had no knowledge of Mary P., alias Lisa W; that while the baby remained at the hospital, the mother had visited just once since her own discharge; that Alexis was born with a positive drug screen for cocaine and opiates; that Mary P.'s drug screen was also positive for such drugs; that she had received no prenatal care; that Mary P. does not receive AFDC or medical coverage; that there were no family members available to care for Alexis; and, that Mary P. had told hospital personnel that she had no baby supplies or crib and had made no preparations for the infant. With respect to the OTC, it was the view of the affiants that given Mary P.'s substance abuse, unstable housing, lack of preparation for the baby, and her history of poor parenting, the newborn would be at risk if released by the hospital to the biological mother's care.
As stated, Mary P. did appear at the initial hearing on the CT Page 1150 OTC (7/26/91). On July 30, 1991, the DCYS worker picked her up at the corner of Main and Westland Streets and brought her to the DCYS office to visit with the baby; the worker then brought Mary P. back to the same street corner, mother again stating that she was staying with her aunt at 2572 Main Street. It was agreed that Mary P. would visit the baby every Tuesday at 9:00 AM at the DCYS office and she was given a monthly bus pass for that purpose. The worker discussed with Mary P. the difficulties that had developed with regard to her previous children, and emphasized that maintaining contact with DCYS and regular visitation were imperative if she wished to eventually have the baby returned to her care. On the same date, the worker discussed with Mary P. the fact the child was born with heroin and cocaine in her system and, more generally, the mother's own long stand-in drug abuse problem; she was told that City Welfare would provide a medical card whereby she could be admitted to a methadone maintenance facility, and she was also advised of the importance of continuing drug treatment and counselling relative to the return of the infant child. Mary P. stated she was going to reside with members of her family to save money in order to eventually have her own apartment. The social worker went over these co-terminus petitions in detail with the mother, and discussed her past history with DCYS and the fact that all of her children had been removed from her care. Mary P. was given a picture of her daughter Sierra (in the process of being adopted), the seriousness of the co-terminus petitions filed on Alexis P. was emphasized, and the mother was fully informed of the advisability of regular visitation) and prompt, continuing drug abuse therapy. A service agreement was drawn up and gone over with, and fully explained to, Mary P.; she was told that noncompliance with its terms would quite likely result in her also losing this baby. As stated, it was left that Mary P., using the bus pass provided, would visit with the baby every Tuesday at the DCYS office in Hartford.
Mary P. did not appear for the visit on the following Tuesday; as of the initial date of trial, the social worker, despite efforts to locate the mother. never saw her after July 30, 1991. Mary P. had given DCYS two telephone numbers; both numbers were called and the parties answering said she did not live at the particular location and that they "did not know who the caller was talking about." Mary P. called the DCYS office in late August 1991 and identified herself (the social worker was not in the office), but left no return telephone number at which the worker could contact her. And, in early September 1991, a representative of the Hartford Housing Authority called the DCYS worker stating that Mary P. had been arrested on larceny charges, had just been released from Niantic, and needed assistance in gaining admittance to a shelter. It was left that the Housing Authority lady would have Mary P. telephone the DCYS worker and CT Page 1151 arrangements would be made to immediately place her in a temporary shelter; however, Mary P. never called the DCYS worker. As of the date of trial, the mother had visited the infant just twice: on July 15, 1991, prior to the infant's discharge from Mt. Sinai Hospital; and, on July 30, 1991, at the DCYS Hartford office.
After the telephone call from the Housing Authority, further efforts were made by the Department to locate respondent/mother. Jesse S., and another aunt, both indicated that they had not seen Mary P. Christine Wallace (also an aunt) stated that Mary P. did not live at the 2572 Main Street address.
As stated, mother did appear on the second scheduled date of trial. As a result, a visitation took place on Tuesday, October 8, 1991; however, on the following Thursday, when by prearrangement the baby was brought to 2572 Main Street (aunt's home), Mary P. was not there.
Alexis P. weighed 5.14 lbs. at birth; as stated, the child was born positive for heroin and cocaine and was held in the hospital beyond the mother's discharge date due to withdrawal symptoms and related complications. As of trial, the child was reported to weigh twelve lbs., still having "a little bit of the jitters". but, aside from that "doing really well." The child has a lesion in her heart, which the medical authorities anticipate "will close up on its own." If parental rights to the child are terminated, the DCYS plan is adoption; as of trial, the Department had "five or six studies" on prospective adoptive families "[t]hat Alexis would be perfect for."
Mary P. has thirteen living siblings of which there are eight sisters and two brothers in Hartford. Ms. Jesse S., an aunt, is a licensed relative DCYS foster mother who is licensed for the care of two children. All of Mary P.'s sisters, except Ms. Jesse S., have active DCYS Protective Services cases.
Adjudication: Neglect/Uncared For Petition
Petitioner is required to prove by a fair preponderance of the evidence that Alexis P., as of the date of the filing of the petitions, was a neglected child in that she would be permitted to live under conditions, circumstances or associations injurious to her well-being; or, that the child was abandoned; or, that Alexis P. was an uncared for child in that said child was homeless.
The court finds that petitioner has proved, by a fair preponderance of the evidence, that Alexis P. was, as of the filing, a neglected and uncared for child as pleaded. Understandably, the hospital professionals felt the infant would CT Page 1152 be at risk if discharged to respondent/mother. Mary P. had no ascertainable, stable housing, she was tragically addicted to drugs, which addiction resulted in the infant being born with cocaine and opiate traces, subjecting the newborn to severe withdrawal difficulties, and she had a long history (known to the hospital) of neglectful parenting. Mary P., as stated, had made absolutely no preparations for the baby, had not applied for financial assistance, was not participating in any drug treatment program, and had no apparent source of income, as well as no medical insurance coverage for herself or for the baby. Given all of these circumstances, together with the minimal interest the mother displayed in the infant, it is apparent that discharging Alexis P. to the care of Mary P. would be permitting the child to live under conditions, circumstances, or associations injurious to the infant's well being. Additionally, the evidence established that the infant child was effectively abandoned: the respondent/mother could not be located, she was determined not to be living at the addresses she had provided, she visited the child in the hospital on only one occasion, had made no preparations for the care of the infant, and had never contacted Mt. Sinai in reference to the child's discharge. Respecting abandonment, the standard is "not whether the parents have shown some interest in their children[;] [c]ommon sense dictates that parent's obligations toward . . her child go further than a minimal interest." (Emphasis in original). In re Rayna M., 133 Conn. App. 23, 37 (1987). Also, the evidence clearly substantiates the allegation that Alexis P. was an uncared for child in that she was homeless: as stated, mother had no ascertainable residence, could not be located, had made no preparations for the care and maintenance of the newborn child, and had not been in contact with the hospital regarding the child's discharge.
The court finds that Alexis P. was a neglected child in that if she was discharged to respondent/mother, the child would be permitted to live under conditions, circumstances or associations injurious to her well-being and, said child is abandoned. Additionally, the court finds that Alexis P. is an uncared for child in that said child is homeless.
Adjudication: Termination of Parental Rights
General Statutes Section 17a-112(b) sets forth the alternative grounds for termination of parental rights. In order to grant a petition to terminate, the court must determine that an alleged ground has been established by clear and convincing evidence. As stated previously, the "clear and convincing" burden of proof is constitutionally mandated. Santosky v. Kramer, supra. This evidentiary requirement necessitates a standard of proof that is between the standard required in any ordinary civil CT Page 1153 action and that required to find guilt; there must be "more than average certainty on the part of the fact finder." In Re Juvenile Appeal (8b-3), 139 Conn. 276, 297 (1933); Dacey v. Connecticut Bar Assn., 170 Conn. 520, 536-37 (1976); In Re Juvenile Appeal, 1 Conn. App. 463, 467-68 (1984). The TPR petition in the instant case was amended on September 17, 1991.
As amended, the petition alleges that the child has been abandoned by the mother in the sense that the parent failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child. See: General Statutes Section 17a-112(b)(1). In the court's view, the evidence establishes, clearly and convincingly, that the child, as of September 17, 1991, was abandoned by Mary P. The mother visited the child just once prior to infant's discharge from Mt. Sinai, and then, although told of the importance of regular visitation, and provided with a bug pass for that purpose, visited the baby on only one occasion between July 19, 1991 and September 17, 1991. As stated, Mary P. made no preparations for the baby, never discussed arrangements with the hospital regarding the infant's discharge, and thereafter, only visited once with the child on July 30. The mother refused, or neglected, to participate in, or cooperate with, the visitation arrangements and schedules established by DCYS; after the one visit on July 30, 1991, the worker never heard from the mother again (as of 9/17/91), mother having made no real effort to contact the social worker, or to communicate with her, respecting the welfare, condition, and well-being of the child. Since the date of the childs birth, Mary P. has maintained no reasonable degree of interest, concern, or responsibility as to the welfare of Alexis P.
The court finds that petitioner has established by clear and convincing evidence that Alexis P. has been abandoned by the respondent/mother in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child.
The termination petition further alleges that the child, Alexis P., has been denied by reason of acts of commission or omission by the respondent/mother the care, guidance or control necessary for her physical, educational, moral or emotional well-being. See: General Statutes Section 17a-112(b)(3). The Appellate Court, in In re Valerie D., 25 Conn. App. 586, 593 (1991), has stated that a petition for termination of parental rights can be supported solely by evidence of a mother's prenatal conduct. Here, respondent/mother had no prenatal care and the child was born testing positive for cocaine and heroin in her system. The hospital reported to DCYS that urine toxicology screens on both mother and child tested positive for the presence of cocaine and opiates; accordingly, the child's discharge from the hospital was CT Page 1154 deferred pending observations of withdrawal symptoms and related complications. Although Mary P. related to hospital staff that she had been receiving and taking methadone, she essentially admitted to the social worker that she had taken cocaine and heroin within seventy-two hours of giving birth; and, as of early September, the testimony indicated that the baby still had "a little bit of the jitters". Mary P. had been in and out of methadone maintenance programs (Hartford Dispensary), but essentially admitted to the worker (contrary to what she had told the hospital) that she was not on methadone maintenance during the period preceding her admission to Mt. Sinai. As observed in Valerie D., courts in other jurisdictions have refused to dismiss petitions alleging neglect predicated on the mother's admitted use of drugs during pregnancy, the child's positive toxicology for cocaine at birth, and the mother's failure to enroll in a drug rehabilitation program. Mary P. admittedly consumed cocaine and heroin just prior to the birth of Alexis P., causing the child to be born with symptoms of addiction and withdrawal, made no preparations for the care of the baby, has not participated in drug therapy, and has put nothing in place for the child in terms of medical coverage, housing, or public assistance; the mother had visited only twice with the child as of September 17, 1991, and she had not contacted DCYS regarding the care and condition of the child.
The court concludes that the evidence establishes. clearly and convincingly, that this child has been denied, by reason of an act or acts of parental commission or omission, the care, guidance or control necessary for her physical, educational, moral or emotional well-being.
Statutory One Year Requirement
Section 17a-112(b) permits the court to terminate parental rights upon clear and convincing proof of one or more of the four grounds set forth therein, provided, that the termination is in the best interests of the child, and, that the circumstances constituting the ground for termination have existed "over an extended period of time, which, except as provided in subjection (c) . . . shall not be less than one year." Subsection (c) permits the court to waive the one year requirement if, from the totality of the circumstances surrounding the child, a waiver is necessary to promote the best interests of the child.
Mary P. has a nine year history of drug abuse, an extensive criminal record, Alexis P. is her fourth child to be born drug addicted, and another child was found, at age 3, to have ingested a "large amount" of cocaine while in the mother's care (requiring hospitalization and resulting in severe seizures). The mother has visited with this child just twice, has not contacted DCYS CT Page 1155 concerning the child, and has neither expressed nor exhibited any interest in the baby. The mother remains drug addicted, has a long history with the criminal justice system) and, over the years to the present has taken no steps to address her long standing substance abuse problem by following through with drug therapy. In short, nothing has changed (or improved) over the course of Mary P.'s several years of DCYS involvement respecting all of her children; she has continued unable to provide a home for the children born of her, has not secured income, through public assistance or otherwise, to provide for Alexis P.'s basic needs, and has maintained no contact with DCYS relative to parent support services that might be put in place.
Alexis P., on the other hand, is recovering from the physical trauma imposed upon her as a result of Mary P.'s drug use during pregnancy, and is thriving in the nurturing foster home where she has received appropriate care and attention; however, the child should not remain for any prolonged period in the uncertain environment of foster placement. Given the mother's long history with DCYS, the conspicuous absence of any improvement regarding her capacity to appropriately parent a child, and her many years of continuing drug addiction, it is the court's view that the best interests of Alexis P. are not served by deferring termination of parental rights for the one year statutory period. Alexis P. is adoptable; she needs and deserves a loving, permanent, nurturing, safe, wholesome, secure home.
It is hereby found that petitioner has established, by clear and convincing evidence, that from the totality of the circumstances surrounding this child, a waiver of the one-year requirement contained in Section 17a-112(b) is necessary to promote the best interests of the child.
Best Interests of Alexis P.
Aside from the issue of waiver of the one-year requirement discussed in the preceding section of this opinion, Section17a-112(b) provides that the court may grant a petition to terminate only when it finds, on the basis of clear and convincing proof, that to terminate parental rights would be in the best interests of the child. And, prior to a determination on disposition, the court is statutorily required to consider the six factors set forth in General Statutes Section 17a-112(d). The last date on which evidence was received on these petitions was October 29, 1991.
As stated heretofore, the evidence, in my view, establishes, clearly and convincingly, that it is in the best interest of Alexis P. to terminate respondent/mother's parental rights, thereby freeing this child for adoption. Mother has had only CT Page 1156 minimal visitation with the child, has maintained virtually no contact with DCYS relative to any return of Alexis, and she has expressed no real interest in the child's welfare. Considering Mary P.'s past performance, and her lack of any concern or interest in this child, it does not serve Alexis' best interest to remain indefinitely in foster placement; rather, the child's best interests are to be served by permanency; that is, a secure, safe, loving permanent home.
The court has considered, carefully, the factors enumerated in Section 17a-112(d)(1) through (6), and hereby finds (applying a clear and convincing standard), the following:
(1) Timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent.
Respondent/mother has not communicated with DCYS or made any effort to keep the agency informed of her whereabouts. For almost the entire duration that Alexis P. has been in foster care, the Department, despite diligent efforts, has been unable to locate Mary P. Thus, it was not possible to put services in place and DCYS efforts toward effectuating a reunification (visitation, drug therapy, assistance in securing housing, income, etc.) were effectively thwarted by Mary P.'s refusal to cooperate.
(2) Terms of any applicable court order entered into and agreed upon by an individual or agency and the parent, and the extent to which all parties have fulfilled their obligations under such order.
No court orders placing obligations or respondent/mother entered in these proceedings, primarily because Mary P. failed to appear at most of the scheduled court hearings. On July 30, 1991, a service agreement was drawn up and the expectations of the agency were fully explained to Mary P.; the mother failed to comply with such expectations, did not visit the child, and did not cooperate with DCYS in working toward reunification.
(3) Feelings and emotional ties of child with respect to her parents, any guardian of her person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties.
This child has not attained one year of age. Given the young age of the child, the fact that the child has never been in the mother's care, and considering mother's extremely minimal visitation, feelings or emotional ties on the part of the child toward Mary P. are unlikely. The evidence indicated that this CT Page 1157 very young child is thriving in the foster home; however, there was no evidence as to bonding, or the extent of any bonding, between the child and her foster parent(s).
(4) The age of the child
Alexis P. was born on July 9, 1991. Given the child's age, she is certainly adoptable; considering the mother's lack of contact with, and disinterest in, the child, I termination is in Alexis P.'s best interests.
(5) The efforts the parent has made to adjust her circumstances, conduct and conditions to make it in the best interests of the child to return to her home in the foreseeable future, including, but not limited to, (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent, provided the court may give weight to incidental visitations, communications, or contributions and (B) maintenance of regular contact or communication with the guardian or other custodian of the child.
Mary P. has not maintained contact, or had continuing communications, with DCYS concerning the child, or the eventual return of Alexis P. to her care. There have been no real or significant efforts on the part of respondent/mother towards a reunification with this young child, or in adjusting her circumstances, conduct and conditions to provide a home to which the child, in her best interests, could return in the foreseeable future. Respondent/mother has had only minimal visitation with Alexis P., and has maintained no regular contact with the child for the purpose of working towards reunification. Mary P. has had no contact or communication with the foster parent, guardian, or other custodian of Alexis P.
(6) The extent to which a parent has been prevented from maintaining a meaningful relationship with the child by the unreasonable act or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent.
Respondent/mother has not been prevented in any way, or by any one, from developing and/or maintaining a meaningful relationship with the child. Mary P. neither cooperated with the Department, nor followed through on any steps toward maintaining any relationship with this infant child.
The petitioner has met its burden of proof by clear and convincing evidence; the best interest of Alexis P. will clearly be served by freeing the child for adoption, and by provision of a safe, stable, loving, secure, permanent home environment. CT Page 1158
The petition to terminate the parental rights of Mary P. to her child, Alexis P., is hereby Granted; and the Department of Children and Youth Services is appointed Statutory Parent for the said Alexis P.
In accordance with General Statutes Section 17a-112(i), the written progress report (case plan report) shall be submitted to this court by the Commissioner within ninety (90) days, and thereafter as the court may require, but no less often than annually.
MULCAHY, J.